# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| STEWART TITLE GUARANTY COMPANY | ) ) ) | |
| Plaintiff, | ) ) | No. 12 C 08918 |
| v. | ) ) ) | Judge John J. Tharp, Jr. |
| INSPECTION AND VALUATION INTERNATIONAL, INC. & IVI INTERNATIONAL, INC., | ) ) ) ) | |
| Defendants. | | |

## MEMORANDUM OPINION AND ORDER

This lawsuit concerns the renovation of Hotel 71 at 71 East Wacker Drive in Chicago, Illinois. The plaintiff in this case, Stewart Title Guaranty Company ("Stewart"), brings subrogation, breach of contract, and negligent misrepresentation claims against IVI International, Inc. and Inspection and Valuation International, Inc. (collectively, "IVI"). Stewart claims that IVI breached its agreement with Wachovia, Stewart's assignor and subrogor, by failing to detect or report problems with renovation work on Hotel 71. Stewart also claims that IVI negligently misrepresented the progress of the renovations.

IVI now moves to dismiss Stewart's complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons explained below, IVI's motion is granted. Stewart's claims against IVI are time-barred. Further, Stewart's claim against IVI for negligent misrepresentation is dismissed by application of the economic loss rule.

## I. Factual Background[1]

Stewart is a title insurance underwriter in Illinois. In 2005, Column Financial Inc. loaned H&S Hotel Property LLC ("H&S"), a developer, more than $100 million for the purchase and renovation of Hotel 71. Column initially disbursed approximately $64 million of the loan to H&S on March 30, 2005, as purchase money. The remaining $36 million was placed in escrow or reserve accounts for future payments, of which $19,704,967 was placed in a reserve account specifically designated for renovation expenses. In connection with a mortgage against the title to the property, Stewart underwrote a title insurance policy to Column Financial. Column assigned its rights under the loan, the mortgage, and the title insurance policy to a trust. Wachovia Bank, N.A. ("Wachovia") managed and administered some of the obligations of the trust.

From June 2005 until March 2007, renovations at Hotel 71 progressed. H&S contracted with an architect, construction managers, trade contractors, management companies, and vendors. Wachovia disbursed funds from the renovation reserve account to pay them. Prudently, but ultimately to no avail, Wachovia also sought to protect the trust's interests by contracting with IVI to serve as a project manager. By agreement, IVI was to (1) periodically visit the project site; (2) attend monthly job meetings; (3) review and evaluate work in progress, completed work, and work to be performed; (4) determine whether work was proceeding according to plans, schedule, and budget; (5) provide project management and oversight; (6) provide written reports of progress; (7) evaluate and certify construction contractor pay

---

[1] In reviewing a motion to dismiss, the Court accepts the plaintiff's well-pleaded factual allegations as true and draws all reasonable inferences in its favor. *Gessert v. United States*, 703 F.3d 1028, 1033 (7th Cir. 2013). The facts recited here are taken from the plaintiff's amended complaint and are presumed to be true only for purposes of evaluating this motion.

applications (also known as "Draw Requests," which included invoices, contractor affidavits, and mechanics' lien waivers); (8) advise on matters that would affect timely completion of the project; and (9) send a licensed architect to periodically visit the project site. As for the Draw Requests, IVI was responsible for their review, after which H&S submitted them to Wachovia for payment. Stewart alleges that IVI certified Draw Requests totaling $19,873,441 for work performed through February 12, 2007, more than the total amount of funds held in the renovation reserve account.

Stewart (to which Wachovia's claims against IVI were ultimately assigned) also alleges that IVI "repeatedly reported" that it received "current and generally appropriate" lien waivers from the principal suppliers and subcontractors, that the project was progressing in conformance with plans, that no areas of unsatisfactory workmanship were observed, and that work completed was performed in accordance with generally accepted construction industry standards. Stewart further alleges that Wachovia relied on IVI's reports before issuing payments from the renovation reserve account.

On October 29, 2007, H&S filed for Chapter 11 bankruptcy. *In re Chicago H&S Hotel Property, L.L.C.*, Case No. 07-20088 (Bankr. N.D. Ill.). Sometime before February 14, 2008,[2] Wachovia learned that, notwithstanding the $19.8 million in disbursements from the construction escrow account that IVI had certified, there were some $6.8 million of mechanics' liens pending on the project as of the filing of H&S's bankruptcy petition. Based on the H&S bankruptcy filings (of which the Court can take judicial notice), these liens appear to have prompted the

---

[2] Stewart's complaint for declaratory judgment against Wachovia (*see* below) alleges that Wachovia had actual knowledge of millions of dollars of mechanics' liens against the property during 2006 and 2007, but for purposes of this opinion, it suffices that Wachovia clearly had knowledge of the liens by the time it asserted its coverage claim against the title insurance policy.

3

filing, at least in part. In any event, it is clear that Wachovia knew of these liens as of February 14, 2008, because on that date Wachovia advised Stewart of the bankruptcy and submitted a written claim to Stewart seeking indemnity for loss or damage resulting from the lack of priority of the mortgage by virtue of those same liens. In short, the H&S bankruptcy left Wachovia holding the bag for the liens because the funds set aside for the renovation escrow account were already depleted; Wachovia therefore sought coverage under the title insurance policy because the H&S default had effectively reduced the value of its mortgage by about $6.8 million.[3] Stewart responded on October 27, 2008 by filing an action against Wachovia seeking a declaration that no coverage existed under the title policy for the mechanics' liens. Wachovia then counterclaimed. *Stewart Title Guaranty Co. v. Wachovia Bank, N.A., as Master Servicer and Special Servicer for Wells Fargo Bank, N.A., as Trustee for Credit Suisse First Boston Mortgage Securities Corp., the Assignee of Column Financial, Inc.*, Case No. 08-CH-40378 (Ill. Cir. Ct. Cook Cnty.).

Sometime after October 27, 2008, Wachovia's counsel received discovery from trade contractors in the underlying mechanics' lien litigation that did not match Draw Requests provided to Wachovia by IVI during construction. In particular, Draw Request invoices and lien waivers appeared to have been altered to increase dollar amounts, change project addresses, falsify signatures, and conceal or falsify the identity of the project on which certain contractors were working. Christopher M. Falor, a representative of the developer who was responsible for submitting contractor invoices and preparing Draw Request paperwork, ultimately pled guilty in 2011 to a superseding criminal information alleging, among other things, that the Draw Requests

---

[3] Ultimately, as part of the resolution of the bankruptcy proceedings, Wachovia purchased the Hotel 71 property in a transaction expressly conditioned upon its funding of an escrow account to cover payments to the mechanics' lien claimants in the amount of $6,852,479.

4

submitted by H&S included fabricated and inflated expenses, fictitious invoices, and false waiver of lien forms. *See United States v. Falor,* No. 10 CR 537, Dkt. 28 (superseding information) and 34 (entry of guilty judgment). Stewart's chief complaint against IVI is that IVI breached its agreement with Wachovia by failing to exercise the appropriate standard of care in reviewing the status of the project and the propriety of disbursements and in negligently misrepresenting the status of the project in its reports to Wachovia.[4]

## II. Discussion

Stewart asserts three claims against IVI: (1) subrogation; (2) breach of contract; and (3) negligent misrepresentation. IVI makes two arguments in favor of dismissing each of Stewart's claims. First, IVI argues that all three of Stewart's claims are time-barred by the four-year statute of limitations set forth in 735 ILCS 5/13-214 ("Construction – Design management and supervision"). Second, IVI argues that Stewart's claim for negligent misrepresentation is barred by the economic loss doctrine.

This case involves diversity jurisdiction, so the Court will apply state substantive law. *See Fednav Intern. Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 837-38 (7th Cir. 2010); *see also Conover v. Lein*, 87 F.3d 905, 907 (7th Cir. 1996) (timeliness of diversity action is governed by Illinois law, including the Illinois statute of limitations). Further, the parties agree that Illinois law applies. *See Fednav*, 624 F.3d at 838 (forum state's law applies absent a conflict-of-laws dispute).

---

[4] Wachovia later sold the project to CVOF 71, LLC. On or near March 1, 2012, Stewart settled its lawsuit against CVOF (formerly against Wachovia) by paying CVOF a confidential sum. CVOF assigned certain claims to Stewart, including claims against IVI, which are the subject of this lawsuit. Stewart filed its complaint against IVI in the Circuit Court of Cook County on October 19, 2012. IVI removed the lawsuit to federal court on November 7, 2012, pursuant to 28 U.S.C. § 1332 based on complete diversity of citizenship between the parties.

### A. Stewart's Claims are Time-Barred.

IVI first argues that Stewart filed its lawsuit after the statute of limitations expired, and that therefore Stewart's complaint should be dismissed in its entirety. The Court agrees.

The parties agree that the statute of limitations applicable to Stewart's claims is 735 ILCS 5/13-214, which states:

> Actions based upon tort, contract or otherwise against any person for an act or omission of such person in the design, planning, supervision, observation or management of construction, or construction of an improvement to real property shall be commenced within 4 years from the time the person bringing an action, or his or her privity, knew or should reasonably have known of such act or omission.

The purpose of this statute is to "prevent liability in perpetuity against persons involved in the design and construction of buildings, such as architects, contractors and engineers (*see* 80th Ill. Gen. Assem., House Proceedings, May 25, 1979, at 11)." *DeMarco v. Ecklund*, 341 Ill. App. 3d 225, 228, 792 N.E.2d 404, 407 (2d Dist. 2003) (citation omitted). This statute expresses the so-called "discovery" rule; an aggrieved party has four years to file a claim from the time they discover (or reasonably should have discovered) harmful acts or omissions. *See Ctr. Ice of Dupage, Inc. v. Burley's Rink Supply, Inc.*, No. 96-C-5537, 1997 WL 43230, at *2 (N.D. Ill. Jan. 24, 1997) (defining the "discovery rule" in the context of Section 13-214).

Here, the parties dispute at what point in time Wachovia discovered or reasonably should have discovered IVI's alleged wrongs.[5] Stewart maintains that its claims against IVI did not accrue until Wachovia discovered, after October 27, 2008, that H&S falsified, modified, altered, or created documents that were submitted by certain contractors. Stewart argues, in essence, that it was only the discovery of H&S's fraud that put Wachovia on notice of potential claims against

---

[5] As Wachovia's assignee/subrogee, Stewart stands in Wachovia's shoes and application of the statute of limitations is governed by the date that Wachovia was on inquiry notice of its claims. *See Dix Mut. Ins. Co. v. LaFramboise*, 149 Ill. 2d 314, 319, 597 N.E.2d 622, 625 (1992).

IVI. For its part, IVI counters that Stewart's focus on the discovery of the H&S fraud is misplaced because Wachovia was on notice well before then that IVI may have fallen short in the performance of its contractual duties to monitor the course of the project and to certify that project expenditures were in order. IVI argues that by February 14, 2008, when Wachovia asserted a claim on the title insurance policy, Wachovia knew that, despite IVI's Draw Request certifications and statements that the principal contractors on the projects had granted lien waivers, thirty-six suppliers and subcontractors were claiming that they were owed almost $7 million for materials and labor. Wachovia also knew that it had already disbursed almost $20 million to H&S, more than the entire renovation reserve account for the project, to pay material suppliers, contractors, and subcontractors.

The Court finds that time began to accrue on or before February 14, 2008, when Wachovia knew there was a significant problem with the renovation reserve account and also knew, or should have known, that it might have an actionable claim against IVI. The Illinois Supreme Court has interpreted the "discovery period" in 735 ILCS 5/13-214 to begin "when a person knows or reasonably should know of his injury *and* when a person knows or reasonably should know that it was wrongfully caused." *LaSalle Nat'l Bank v. Skidmore, Owings & Merrill, et al.*, 262 Ill. App. 3d 899, 902, 635 N.E.2d 564, 567 (1st Dist. 1994) (emphasis in original) (citing *Cnty. of Du Page v. Graham*, 109 Ill. 2d 143, 153-54, 485 N.E.2d 1076, 1080 (1985)). An aggrieved party has knowledge that an injury is "wrongfully caused" when he or she possesses "enough information about the injury to alert a reasonable person to the need for further inquiries to determine if the cause of the injury is actionable at law." *Id.*

Taking as true the amended complaint's factual allegations, Wachovia knew on February 14, 2008, at the latest, that IVI failed to report almost $7 million in mechanics' liens. In fact, IVI

7

certified that it received "current and generally appropriate" lien waivers from the principal suppliers and subcontractors for work performed through February 2007. IVI argues that mechanics' liens are common and the existence of such liens does not necessarily imply malfeasance. That is true enough, but IVI essentially told Wachovia that there were no liens, and Wachovia knew by February 2008 that IVI's representation in that regard was, at best, grossly inaccurate. By that time, Wachovia knew that the principal suppliers and contractors could not have granted all necessary lien waivers: there were outstanding claims by those suppliers and contractors that they were owed almost $7 million for materials and labor and that based on IVI's Draw Request certifications, the entire renovation reserve account—almost $20 million—had already been paid to H&S. Put another way, Wachovia knew by the time it asserted a claim on Stewart's title policy that IVI, the firm it hired to "determine whether the work was proceeding in accordance with the approved plans, schedule and budget," Am. Compl. ¶ 18.d., had failed to provide timely notification that there was a cost overrun on the project of about 35 percent (the $7 million in outstanding liens divided by the $20 million renovation budget). These facts were more than sufficient to put Wachovia on notice not only that something was amiss with the renovation project but also that IVI may not have performed adequately its duties to keep tabs on the project. Accordingly, they mark the latest date by which the statute of limitations on Wachovia's claims against IVI began to run.

Discovery of the H&S fraud is irrelevant to this analysis. Wachovia knew that it had been injured by the appearance of unreported mechanics' liens well before it learned that H&S's fraud might have caused some or all of those liens, and Stewart's claim, in any event, is not against H&S for fraud but against IVI for failing to perform its duties as Wachovia's project manager. Those duties may have included fraud detection, but they also included (according to Stewart's

8

amended complaint) the failure "to identify, detect or report that the Draw Requests actually lacked 'current and generally appropriate' lien waivers from the principal suppliers and subcontractors." Am. Compl. ¶ 37.h. The relevant issue for purposes of the statute of limitations is whether Wachovia (now represented by Stewart) had reason to investigate whether it had a claim against IVI based on IVI's failure to alert it to the pending mechanics' liens and its erroneous certifications that lien waivers had been received from the project's contractors and suppliers. The developer's fraud has no bearing on this question; IVI could be liable for breaching its duties to Wachovia even if no fraud contributed to the cost overruns. Fraud or not, on discovering millions in unreported mechanics' liens, Wachovia had ample reason to believe that IVI had dropped the ball and might therefore be liable to Wachovia. Stewart was, then, required to file suit on or before February 14, 2012; its claims arising from IVI's alleged breach of its duties as project manager, filed in November 2012, are therefore time-barred.

### B. Stewart's Claim for Negligent Misrepresentation is Barred by the Economic Loss Doctrine.

Stewart's claim for negligent misrepresentation must be dismissed for a second reason. Stewart alleges that IVI made a variety of negligent misrepresentations to Wachovia regarding the "progress, quality, quantity and status of the work" on Hotel 71, as well as the budget and schedule. Am. Compl. ¶ 48. In particular, Stewart alleges that IVI failed to report to Wachovia that (1) contractors who were not performing work on Hotel 71 were nonetheless submitting pay requests; (2) a general contractor who attested to Draw Requests was not observed or interviewed by IVI and never performed work on the hotel; (3) IVI did not properly oversee the Draw Requests for the project; (4) IVI did not attend or report that it failed to attend monthly job meetings; (5) IVI did not report that work did not appear to be in conformance with plans; and

9

(6) IVI did not report issues that would affect timely completion of the renovation project. Stewart further alleges that Wachovia relied on IVI's negligent misrepresentations.

IVI argues that Stewart's negligent misrepresentation claim is barred by the economic loss doctrine. In Illinois, suits for "solely economic loss[es]" are generally not recoverable in tort. *See Moorman Mfg. Co. v. Nat'l Tank Co. et al.*, 91 Ill. 2d 69, 81, 435 N.E.2d 443, 448 (1982); *see also First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 218 Ill. 2d 326, 337, 843 N.E.2d 327, 333 (2006). *Moorman* defines "economic loss" as "damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits – without any claim of personal injury or damage to other property." 91 Ill. 2d at 82 (citation omitted). The familiar rationale of the economic loss doctrine is that "contract law and the Uniform Commercial Code offer the appropriate remedy for economic losses occasioned by diminished commercial expectations." *Hartford Fire Ins. Co. v. Henry Bros. Constr. Mgmt. Servs., LLC*, 877 F. Supp. 2d 614, 619 n.3 (N.D. Ill. 2012) (citation omitted).

There is an exception to *Moorman* that is relevant to this case – a tort claim for negligent misrepresentation can stand if a party negligently conveys false information and that party is in the business of supplying information for the guidance of others in their business transactions. *See First Midwest Bank*, 218 Ill. 2d at 337; *see also Tolan and Son, Inc. v. KLLM Architects, Inc., et al.*, 308 Ill. App. 3d 18, 27, 719 N.E.2d 288, 296 (1st Dist. 1999) (stating test as (1) the defendant is in the business of supplying information for the guidance of others in their business dealings; (2) the defendant provided information that constitutes a misrepresentation; and (3) the defendant supplied the information for guidance in the plaintiff's business dealings).

The key question in assessing whether a defendant is in the business of supplying information is whether the parties' relationship is in furtherance of the creation of a tangible

10

product. Where the ultimate result of the contractual undertaking is the creation of a tangible product, the economic loss doctrine generally bars recovery of damages in tort. *See, e.g., Hartford Fire*, 877 F. Supp. 2d at 620 ("[I]f the intended end result of the relationship is for the defendant to create a product – a tangible thing – then the defendant will not fit into the 'business of supplying information' negligent misrepresentation exception."); *MW Mfrs., Inc. v. Friedman Corp.*, No. 97-C-8319, 1998 WL 417501, at *4 (N.D. Ill. July 21, 1998) (negligent misrepresentation claim barred because the "end result of the plaintiff-defendant relationship" was for the defendant software vendor to create a product, "a tangible thing"). It is not always clear, however, whether a business is merely supplying intangible information or facilitating the creation of a tangible product, particularly in the construction context. For that reason, there are no absolutes, and no bright lines, that govern application of this exception in Illinois. Rather, the Court must undertake a "precise, case-specific inquiry." *Tolan and Son,* 308 Ill. App. 3d at 27.

According to the amended complaint, IVI used "a licensed architect" to oversee the renovation project and "in the usual course of events, architects and engineers provide information, plans, and specifications that are incorporated into a tangible product, building, or structure." *Tolan and Son*, 308 Ill. App. 3d at 27, 31 (negligent misrepresentation claim barred because architect and engineer provided information that was ancillary to their role in designing and constructing buildings); *see also Guitar Ctr. Stores, Inc. v. 7250 South Cicero Equities, LLC*, No. 07-C-4227, 2007 WL 3374592, at *3 (N.D. Ill. Nov. 8, 2007) (negligent misrepresentation claim barred because contractor informing purchaser about progress of construction was not in business of supplying information). Seeking to fit within the information business exception, however, Stewart casts IVI not as an architect or construction manager but as an information purveyor retained solely as a consultant "to inspect work, report to and advise Wachovia." Pl.'s

11

Br. 11. And it is true enough that a defendant's occupational title does not determine whether the economic loss rule applies. "[T]here may well be situations where a plaintiff may maintain a cause of action against an architect or engineer based on the negligent misrepresentation exception," such as where the architect or engineer is "engaged solely to provide information based upon an evaluation and the value of the services lies in its analytical work rather than a tangible end product." *Tolan and Son*, 308 Ill. App. 3d at 21, 27, 30. *See also, e.g., Tribune Co. v. Geraghty & Miller, Inc.*, No. 97-C-1889, 1997 WL 438836, at *3 (N.D. Ill. July 25, 1997) (negligent misrepresentation claim allowed because defendant environmental assessment services provided analytic work in a report); *see also Ill. Bell Tel. Co. v. Plote, Inc., et al.*, 334 Ill. App. 3d 796, 800, 778 N.E.2d 1203, 1206 (2002) (negligent misrepresentation claim allowed because defendant phone company provided information about the location of its facilities).

This, however, is not such a case. IVI was retained to supervise a construction project—namely, the renovation of Hotel 71. Any information IVI provided to Wachovia – such as the written progress reports and certified Draw Requests – was learned from job meetings, visits to the construction site, and other activities related to IVI's role providing "project management and oversight for the Project." Am. Compl. ¶ 18.e. This information was part and parcel of the construction and had no independent significance; ultimately, it was "transformed into the building itself." *2314 Lincoln Park West Condo. Ass'n v. Mann, Gin, Ebel & Frazier, Ltd., et al.*, 136 Ill. 2d 302, 313, 555 N.E.2d 346, 351 (1990) (negligent misrepresentation claim barred because even though "it may be the case that an architect does in fact supply information," the information supplied by the architect here is "merely incidental" and "is transformed into the building itself"); *see also, e.g., Fireman's Fund Ins. Co. v. SEC Donohue, Inc.*, 176 Ill. 2d 160,

169, 679 N.E.2d 1197, 1201 (1997) (negligent misrepresentation claim barred because engineer's plans and drawings were incidental to a tangible product, *i.e.*, a water supply system).

In this regard, this case is indistinguishable from *Hartford Fire*.[6] There, the court dismissed a plaintiff's negligent misrepresentation claim where the defendant construction management company was retained to supervise the renovation of a school. 877 F. Supp. 2d at 621. As here, the defendant construction manager's responsibilities included supervising contractors and subcontractors, inspecting work, and reporting problems. *Id.* The court found that the "end product … was not the information … [but] the completion of the school renovation project." The defendant, the court concluded, was in the business of supervising construction, not supplying information. *Id.* at 621-22.

So too here. The information IVI supplied (or was supposed to supply, in any event) was incidental to and for the purpose of facilitating the creation of a tangible product: the renovated Hotel 71. Accordingly, the Court concludes that IVI was not in the business of supplying information and cannot be sued for negligent misrepresentation under that exception to the economic loss doctrine. Stewart's claim for negligent misrepresentation fails as well on this additional basis.

\*    \*    \*

For the reasons set forth above, the defendants' motion to dismiss is granted and the complaint is dismissed with prejudice in its entirety.

---

[6] *Hartford Fire* is not, of course, controlling authority, but Judge Dow's comprehensive discussion of the business information exception to the economic loss doctrine in that case, and its application in the closely analogous situation of a construction manager, is highly persuasive.

Entered: October 10, 2013

John J. Tharp, Jr.
United States District Judge